IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 83493-2-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LANCE GENE FRANCOISE ROUGEAU, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |
| | ) | |

VERELLEN, J. — Lance Rougeau challenges his convictions for first degree felony murder, first degree burglary, residential burglary, and theft of a motor vehicle. Rougeau focuses on limited evidence of his participation in the crimes to argue that the trial court erred in instructing the jury on accomplice liability. But where the evidence is sufficient to support the theory that the defendant acted as the principal, the evidence is also sufficient to support the alternative theory that the defendant's level of participation was adequate for accomplice liability. Because the evidence was sufficient to support the State's theory that Rougeau acted as the principal in committing the crimes and the alternative theory that he participated with others in committing the crimes, the jury instruction on accomplice liability was appropriate.

Rougeau also fails to establish the trial court abused its discretion in admitting evidence regarding Linda Sweezer's granddaughter and in denying Rougeau's two motions for mistrial.

Rougeau contends that the prosecutor committed misconduct in opening statement and closing argument. Here, the prosecutor committed misconduct in closing argument by discussing evidence not admitted at trial and by making statements which served no purpose other than to encourage an emotional reaction from the jury. But taking the prosecutor's statements in the context of the evidence as a whole, Rougeau does not establish a substantial likelihood that the prosecutor's misconduct affected the jury's verdict.

Because the trial court erred in failing to conduct a same criminal conduct analysis on two of Rougeau's convictions from 2014, we accept the State's concession and remand for resentencing. And because the prosecutorial misconduct is the only trial error committed here, that error alone is insufficient to implicate the cumulative error doctrine.

Therefore, we affirm the convictions and remand for resentencing.

## FACTS

The issues require a detailed review of the evidence. On Monday, October 23, 2017, Linda Sweezer did not show up to work. That evening, Sherria Dooling-Rodin was at the Emerald Queen Casino in Tacoma. Dooling-Rodin saw Lance Rougeau in a black vehicle in the parking lot of the casino and asked him for a ride to Forest Canyon Road in the Auburn/Bonney Lake area. After arriving, Dooling-Rodin decided to drive to Seattle with Rougeau because he told her "he could get [her] heroin."[1] She drove to Seattle, where the two smoked crack cocaine. Dooling-Rodin drove them back to the

---

[1] Report of Proceedings (RP) (Feb. 11, 2020) at 895.

Auburn/Bonney Lake area, where they arrived around 12:00 a.m. Dooling-Rodin's friend, Chase Waters, picked her up with his friend Kyle Wason in the vehicle.

Dan Rouse, a resident who lived on 169th Avenue in Lakeland Hills, an Auburn neighborhood, testified that at approximately 1:30 a.m., his security cameras affixed to his house showed two vehicles stop near 166th, a flash of light, and the same two vehicles drive away. About 20 minutes later, Randall Jacks, a resident who lived near Rouse in Lakeland Hills, testified that his doorbell camera showed Rougeau wearing a Seahawks jersey walk onto his porch and then turn around.

At 2:00 a.m., Salvador Morales, who lived on 63rd Street in Lakeland Hills, was driving home when Rougeau, who was standing by a Nissan, waved him down. Rougeau told Morales that he needed gas. When Morales returned with gas, the Nissan still did not start. Rougeau used Morales's cell phone to call his mother and brother for help. Morales went home.

At 3:30 a.m., Jennifer Johnson was driving home from a friend's house when she saw the body of a woman lying in the road near 166th Avenue in Lakeland Hills. Johnson called 911. The woman was wearing a t-shirt and pajama pants and was partially covered by a blanket that had been lit on fire. The forensic investigators, working with the medical examiner, conducted a facial recognition identification examination and identified the body as Sweezer. The medical examiner testified that he was unable to estimate a time of death. He stated that Sweezer was stabbed at least 35 times, but that her cause of death was manual strangulation.

Joni Ly, another Lakeland Hills resident who lived about a mile and a half from where Sweezer's body was found, testified that at 4:35 a.m., his security camera affixed

3

to his house showed a man wearing a hat and a reflective safety vest walk toward his neighbor, Dixie Reynolds' house.

At 5:00 a.m., Reynolds heard the sound of her garage door motor. Reynolds saw someone drive her car away and realized that someone had rummaged through her bag and stolen her daughter's backpack. And when Reynolds went in her garage, she noticed that the window was open and that someone had removed the screen and placed it on the ground.

At 6:45 a.m., Jacks noticed that there was a Nissan parked oddly and abandoned near his house. Jacks contacted the Auburn Police Department. The responding officers ran the license plate of the black Nissan and discovered that Sweezer was the registered owner. Officers located Sweezer's Nissan about two and a half miles from where her body was found near 166th Avenue in Lakeland Hills.

The officers searched Sweezer's Nissan. Inside the vehicle, they found a phone belonging to Randy Mullins.[2] Cell phone data recovered from the device revealed that at 1:36 a.m. on October 24, the phone was close to where Sweezer's body was found, and at 1:51 a.m., the phone was close to where Sweezer's Nissan was found.

That evening, around 6:00 p.m., law enforcement arrested Rougeau at his mother's apartment in Kent where he and his brother, Jason Jordan, had been living. At the time of his arrest, Rougeau had scratches on his forearm, hand, and leg and was carrying a backpack with a "GoNavy.com" lanyard. Inside his mother's apartment,

---

[2] Randy Mullins did not testify at trial, and the record on appeal contains no information about him.

4

officers found car keys to Sweezer's and Reynolds' vehicles and Reynolds' daughter's backpack.  After Rougeau's arrest, Sweezer's credit card was used multiple times.

On October 25, 2017, at approximately 10:00 a.m., officers searched Sweezer's house in Kent.  The officers noted that someone had removed a screen from the front window of her residence and placed it on the ground.  The officers found blood stains and blood spatter on the kitchen floor, blood stains in the garage, a bloody knife on the kitchen counter, a "GoNavy.com" lanyard with blood on it, and blood stains on the carpet closest to the kitchen.  Officers also found a broken piece of jewelry on the kitchen floor and noticed that the door to the lockbox was open.  And the officers found Sweezer's severely dehydrated five-month-old granddaughter alive, lying on the bed upstairs.  Dr. Joan Roberts, an attending physician at Seattle Children's Hospital, estimated that Sweezer's granddaughter was left alone for "between 36 and 60 hours."[3]

Forensic investigators testified that they found the DNA[4] of multiple individuals inside Sweezer's vehicle, that Rougeau's DNA was on the outside and inside of her vehicle, and that Sweezer's blood was in the trunk of her vehicle.  Investigators also found Sweezer's blood on the knife, Sweezer's blood and Rougeau's DNA on the "GoNavy.com" lanyard in her kitchen, DNA from at least three individuals on the handle of the lockbox, Rougeau's DNA on the carpet closest to the kitchen, and blood on one of Rougeau's socks which contained the DNA of at least four individuals.

---

[3] RP (Feb. 12, 2020) at 1079.

[4] Deoxyribonucleic acid.

The State charged Rougeau with one count of first degree felony murder based upon first degree burglary, one count of first degree burglary, one count of residential burglary at Reynolds' house, and one count of theft of Reynolds' motor vehicle.

Before trial, Rougeau moved to exclude evidence of Sweezer's granddaughter as not relevant and overly prejudicial. The court denied Rougeau's motion in limine and admitted the evidence for the limited purpose of establishing a timeline of events. In opening statement, the prosecutor made several references to Sweezer's granddaughter. The trial court denied Rougeau's motion for mistrial.

During trial, Rougeau renewed his motion for mistrial when an officer testified about the state of Sweezer's granddaughter when they found her and moved for another mistrial on different grounds. The trial court denied the motions. In closing argument, the prosecutor again made various references to Sweezer's granddaughter. The trial court overruled Rougeau's objections.

Before jury deliberations, the prosecutor requested an accomplice liability instruction. The prosecutor argued that on cross-examination of the State's witnesses, Rougeau's counsel repeatedly alluded to the fact that others were present and participated with Rougeau in the charged crimes. Rougeau's counsel objected to the instruction, arguing that the evidence did not establish that others were present and participated with Rougeau in the charged crimes but rather that Rougeau did not commit the crimes. The court overruled the objection and provided instructions on accomplice liability.

During deliberations, the jury submitted an inquiry asking for clarification on the accomplice liability instruction. In response, the court directed the jury to "reread your

instructions and continue to deliberate."[5]  The jury found Rougeau guilty as charged.

Rougeau's counsel moved for a new trial.  The trial court denied the motion.

At sentencing, the court applied the burglary antimerger statute to two of

Rougeau's prior residential burglary convictions from 2014 and did not conduct a same

criminal conduct analysis.  The trial court sentenced Rougeau to 548 months in prison.

Rougeau appeals.

## ANALYSIS

### I.  Accomplice Liability Jury Instruction

Rougeau argues that the trial court erred in instructing the jury on accomplice

liability because "the evidence did not support it."[6]  We review a trial court's "choice of

jury instructions for an abuse of discretion."[7]  A trial court abuses its discretion when its

decisions are based on untenable grounds or reasons.[8]

"Jury instructions are sufficient if substantial evidence supports them, they allow

the parties to argue their theories of the case, and, when read as a whole, they properly

inform the jury of the applicable law."[9]  "When determining if the evidence at trial was

sufficient to support the giving of an instruction, we view the supporting evidence in the

---

[5] Clerk's Papers (CP) at 168.

[6] Appellant's Br. at 22.

[7] State v. Hathaway, 161 Wn. App. 634, 647, 251 P.3d 253 (2011) (citing State v. Douglas, 128 Wn. App. 555, 561, 116 P.3d 1012 (2005)).

[8] State v. Sanjurjo-Bloom, 16 Wn. App. 2d 120, 125, 479 P.3d 1195 (2021) (citing State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

[9] Hathaway, 161 Wn. App. at 647 (citing State v. Clausing, 147 Wn.2d 620, 626, 56 P.3d 550 (2002)).

light most favorable to the party that requested the instruction."[10]  When the State requests an instruction, all reasonable inferences from that evidence must be drawn in favor of the State and interpreted against the defendant.[11]  "'Circumstantial evidence and direct evidence are equally reliable in determining the sufficiency of the evidence.'"[12]  But "'inferences based on circumstantial evidence must be reasonable and cannot be based on speculation.'"[13]

Rougeau argues there is inadequate evidence of his level of participation in the crimes required for his accomplice liability.  In State v. Munden,[14] the appellate court held that where "the evidence [does] not exclude the possibility that [the defendant] acted as an accomplice, . . . accomplice liability [is] supported."[15]  And in reviewing the Munden decision, our Supreme Court in State v. McDonald held that

> [w]hile Munden hinted at the right approach, we would take a logical step further and hold that because the evidence in this case clearly supports a finding of accomplice liability, we need not engage in the empty exercise of reaching McDonald's principal liability argument or the Court of Appeals' resolution of it.  It is enough to note that "[a]ccomplice liability

---

[10] State v. Fernandez-Medina, 141 Wn.2d 448, 455-56, 6 P.3d 1150 (2000).

[11] State v. Brooks, 107 Wn. App. 925, 928-29, 29 P.3d 45 (2001) (citing State v. Bryant, 89 Wn. App. 857, 869, 950 P.2d 1004 (1998)).

[12] State v. Scanlan, 193 Wn.2d 753, 770, 445 P.3d 960 (2019) (internal quotation marks omitted) (quoting State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010)).

[13] Id. at 771 (internal quotation marks omitted) (quoting State v. Vasquez, 178 Wn.2d 1, 16, 309 P.3d 318 (2013)).

[14] 81 Wn. App. 192, 913 P.2d 421 (1996).

[15] State v. McDonald, 138 Wn.2d 680, 689, 981 P.2d 443 (1999) (citing id. at 197).

represents a legislative decision that one who participates in a crime is <u>guilty as principal</u> regardless of the degree of the participation."[16]

The key issue being raised here is whether, in viewing the evidence in the light most favorable to the State, a reasonable juror could have inferred beyond mere speculation that others were present and participated with Rougeau in the charged crimes so that, at the very least, the State is entitled to an instruction on a viable alternative to its theory that the defendant was liable as the principal actor.

The court's accomplice liability instruction provided:

> A person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime.
>
> A person is an accomplice in the commission of a crime if, with knowledge that it will promote or facilitate the commission of the crime, he or she either:
>
> (1) solicits, commands, encourages, or requests another person to commit the crime; or
>
> (2) aids or agrees to aid another person in planning or committing the crime.
>
> The word "aid" means all assistance whether given by words, acts, encouragement, support, or presence. A person who is present at the scene and ready to assist by his or her presence is aiding in the commission of the crime. However, more than mere presence and

---

[16] <u>Id.</u> (second alteration in original) (quoting <u>State v. Hoffman</u>, 116 Wn.2d 51, 104, 804 P.2d 577 (1991)). "'The legislature has said that anyone who participates in the commission of a crime is guilty of the crime and should be charged as principal, regardless of the degree or nature of his participation. Whether he holds the gun, holds the victim, keeps a lookout, stands by ready to help the assailant, or aids in some other way, he is a participant. The elements of the crime remain the same.'" <u>State v. Holcomb</u>, 180 Wn. App. 583, 588, 321 P.3d 1288 (2014) (quoting <u>State v. Carothers</u>, 84 Wn.2d 256, 264, 525 P.2d 731 (1974)).

knowledge of the criminal activity of another must be shown to establish that a person present is an accomplice.[17]

Here, there is sufficient evidence for a reasonable juror to infer that in accordance with the State's theory, Rougeau acted as the principal in committing the charged crimes. On October 24, at approximately 1:36 a.m., a cell phone found in Sweezer's vehicle was near where Sweezer's body was found. Randall Jacks, who lived a few miles from where Sweezer's body was found, testified that his doorbell camera caught Rougeau walking on his porch at 1:49 a.m. Two minutes later, the cell phone found in Sweezer's vehicle was near where her vehicle was found. At about 2:00 a.m., Rougeau asked Salvador Morales for help with Sweezer's vehicle because it would not start. Forensic investigators found Rougeau's fingerprints and DNA on the inside and outside of Sweezer's vehicle, Sweezer's blood in the trunk of the vehicle, and Sweezer's blood and Rougeau's DNA at her residence. The blood on the carpet outside Sweezer's kitchen was consistent with "the reference profile of Lance Rougeau."[18] Investigators also found Sweezer's blood and Rougeau's DNA on a "GoNavy.com" lanyard in Sweezer's residence. When officers arrested Rougeau, he had scratches on his forearm, hand, and leg, and he was carrying a backpack with a

---

[17] CP at 140. Jury instruction 14 provided that the jury could convict Rougeau of first degree murder if the jury found that "[t]he defendant or an accomplice caused the death of Linda Sweezer in the course of or in furtherance of such crime or in immediate flight from such crime." CP at 143. And jury instruction 19 provided that the jury could convict Rougeau of first degree burglary if "in so entering or while in the building or in immediate flight from the building the defendant or an accomplice in the crime charged assaulted a person." CP at 148. The court did not provide the jury with a specific accomplice liability instruction for the burglary of Reynolds' residence or the theft of her vehicle.

[18] RP (Feb. 27, 2020) at 1956.

"GoNavy.com" lanyard. He also had blood on one of his socks which contained the DNA of at least four individuals. And inside his mother's apartment, officers found the keys to Sweezer and Reynolds' vehicles and Reynolds' daughter's backpack. Sufficient evidence supported the State's theory that Rougeau acted as the principal in committing the charged crimes.

Rougeau's objection to the accomplice liability instruction centers around his faulty premise as argued to the trial court that the court can only use the evidence he presented to support his theory that he was not involved in the charged crimes and that the court, in viewing the evidence in the light most favorable to the State, cannot combine the evidence presented by the parties to establish that he and others were present and participated in the charged crimes.

Specifically, in discussing the accomplice instruction, Rougeau's counsel stated:

> My cross raised the possibility that my client wasn't the one who killed Ms. Sweezer, which is what my client was charged with. He was not charged as an accomplice in the charging documents. He was charged as a principal. And I have continuously and will continue to argue in closing arguments that there is no evidence that my client committed these crimes, and in fact, there's sufficient evidence that somebody else may have committed the crime.[19]

---

[19] RP (Mar. 2, 2020) at 2153 (emphasis added). For example, during cross-examination of Jennifer Hayden, a forensic scientist with Washington State Patrol, Rougeau's counsel engaged in the following exchange suggesting that others were present and participated with Rougeau in the charged crimes:

Q And just so that I'm clear, at one point when you asked for [an] additional reference sample from Sherria Dooling-Rodin so that you could confirm the CODIS hit, law enforcement never provided you with that?

A: Correct.

Q: And they never provided you with DNA samples from a gentleman named Chase Waters?

A: Correct.

But contrary to Rougeau's assertion, viewing the evidence in the light most favorable to the State allows consideration of combined portions of the defense and the State's evidence when determining whether the evidence is sufficient to support a proposed instruction. And notably here, defense counsel clearly committed to presenting the jury with the defense theory that there is "sufficient evidence that somebody else may have committed the crime."[20] In this setting, the trial court had the discretion to conclude an accomplice liability instruction was consistent with defense counsel's acknowledgement that reasonable inferences from the evidence presented by the defense established that someone other than Rougeau had been present and participated in the crimes. Viewed in a light most favorable to the State, there is sufficient evidence based upon reasonable inferences for a rational juror to conclude that others were present and participated with Rougeau in the crimes.

First, as to the burglary of Sweezer's home and her murder, forensic investigators testified that they found the DNA of at least three individuals on the handle of the lockbox in Sweezer's residence and that the lockbox appeared "open and ransacked."[21] Investigators also found Sweezer's blood in the trunk of her vehicle and the DNA of multiple individuals on the inside and outside of her vehicle. Dan Rouse, a

---

Q: They never provided you with DNA samples from a gentleman named Kyle Wason?

A: Correct.

RP (Mar. 2, 2020) at 2077.

[20] Id. at 2153.

[21] RP (Feb. 20, 2020) at 1265.

Lakeland Hills resident, testified that on October 24 at approximately 1:30 a.m., a video surveillance camera affixed to his house showed two vehicles stop at the location where Sweezer's body was found. The video then shows a flash of light and the two vehicles drive away. At some point before officers arrested Rougeau, he told his brother, Jason Jordan, that "something happened that he was not involved with and [he] had to get away but they would not let him leave."[22] And after officers arrested Rougeau, Sweezer's credit card was used multiple times. There is sufficient evidence to support a reasonable inference that others were present and participated with Rougeau in Sweezer's murder and the burglary of her residence.

Second, as to the residential burglary at Reynolds' house, Joni Ly, a Lakeland Hills resident, testified that at 4:35 a.m., his video camera surveillance showed a man wearing a hat and a reflective safety vest walking toward the front door of Reynolds' residence. Reynolds testified that at 5:00 a.m., she heard her garage door open and noticed that her car keys and her daughter's backpack were missing. And when Pierce County Sheriff's Office Detective Jessica Whitehead arrested Rougeau, she found Reynolds' car keys and her daughter's backpack in his mother's apartment. There is sufficient evidence to support a reasonable inference that others were present and participated with Rougeau in the burglary of Reynolds' residence.

Finally, as to first degree theft of a motor vehicle, Ly testified that at 5:05 a.m., his video surveillance showed a man wearing a hat and safety vest drive Reynolds' vehicle out of her driveway. Reynolds testified that she saw her vehicle reverse "around to the

---

[22] RP (Mar. 2, 2020) at 2113 (emphasis added).

cul-de-sac and then turn and go the opposite direction."[23]  And when Officer Whitehead arrested Rougeau, she found Reynolds' car keys in his mother's apartment.  Officers eventually located Reynolds' vehicle in Tacoma.  And Pierce County Sheriff's Office Detective Jason Laliberte testified that the officers had reason to believe that individuals were driving Reynolds' vehicle after Rougeau was arrested.  There is sufficient evidence to support a reasonable inference that others were present and participated with Rougeau in the theft of Reynolds' vehicle.

Because substantial evidence supports the State's alternative theory, that others were present and participated with Rougeau in the commission of the murder, burglaries, and theft, the trial court did not abuse its discretion in instructing the jury on accomplice liability.[24]

---

[23] RP (Feb. 24, 2020) at 1511.

[24] For the first time in his reply brief, Rougeau appears to argue that based upon the evidence presented, a reasonable juror could only conclude that his involvement in the charged crimes was merely "after the fact" which in turn means that the trial court erred in instructing the jury on accomplice liability.  Appellant's Reply Br. at 5-6.  In his argument, Rougeau, citing State v. Robinson, 73 Wn. App. 851, 858, 872 P.2d 43 (1994), emphasizes the distinction between accomplice liability and criminal assistance, noting that "dispos[ing] of evidence of the crime" can only establish criminal assistance.  Appellant's Reply Br. at 6.  But his argument is not compelling.  In Robinson, the defendant was driving a vehicle when one of his passengers jumped out of the car, robbed a girl on the street, and got back in the car.  73 Wn. App. at 852.  The defendant made the passenger throw the purse out the window but did not contact law enforcement.  Id. at 853. The State charged the defendant with one count of second degree robbery based upon an accomplice liability theory.  Id.  The court held that "[b]ecause [the passenger] completed the act of robbery by the time he reentered the car and [the defendant] saw the purse, [the defendant] could not have aided and abetted [the passenger's] crime.  He neither associated himself with [the passenger's] undertaking, participated in it with the desire to bring it about, nor sought to make the crime succeed by any actions of his own."  Id. at 857.  Here, even assuming that a rational juror could conclude that Rougeau was involved only "after the fact," unlike the defendant in Robinson, there was still a competing reasonable inference that Rougeau

II. ER 403

Rougeau contends that the trial court abused its discretion in "admitting evidence that the police found [Sweezer's] infant granddaughter in her house."[25] We review a trial court's evidentiary decisions for an abuse of discretion.[26]

Generally, all relevant evidence is admissible.[27] But even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."[28]

Here, Rougeau pleaded not guilty, which required the State to prove every element of the charged crimes beyond a reasonable doubt. To do so, the State had to establish when events occurred over the course of several days to prove Rougeau's involvement in the crimes. Specifically, on Monday, October 23, at 9:00 a.m., Sweezer did not show up to work. On Tuesday, October 24, at 3:30 a.m., Jennifer Johnson, a Lakeland Hills resident, found Sweezer's body. On Wednesday, October 25, at 10:00 a.m., officers found Sweezer's granddaughter. And Dr. Joan Roberts testified that Sweezer's granddaughter was left alone for "between 36-60 hours."[29] Taken together,

---

associated, participated, and assisted in the charged crimes. Criminal assistance is not applicable. Additionally, we need not consider arguments raised for the first time in a reply brief. Nakatani v. State, 109 Wn. App. 622, 625 n.1, 36 P.3d 1116 (2001); RAP 10.3(c).

[25] Appellant's Br. at 31.

[26] Sanjurjo-Bloom, 16 Wn. App. 2d at 125 (citing Powell, 126 Wn.2d at 258).

[27] Id. (citing ER 402).

[28] ER 403.

[29] RP (Feb. 12, 2020) at 1079.

this evidence helps establish a more definitive timeline for the alleged crimes, notably, the murder of Sweezer. The trial court did not abuse its discretion.

III. Motions for Mistrial

Rougeau argues that the trial court erred in denying his two motions for mistrial. We review a trial court's denial of a motion for mistrial for an abuse of discretion.[30]

A motion for mistrial "will be overturned only when there is a 'substantial likelihood' that the error prompting the request for a mistrial affected the jury's verdict."[31] A court should only grant a mistrial "'when the defendant has been so prejudiced that nothing short of a new trial can ensure the defendant will be tried fairly.'"[32]

First, Rougeau contends that the trial court abused its discretion in denying Rougeau's "motion for a mistrial after a law enforcement witness became emotional when testifying" about Sweezer's granddaughter.[33]

On direct examination, the prosecutor engaged in the following exchange with Pierce County Sheriff's Office Detective Darren Moss:

Q: Detective, once you handed the baby to the medics, where did you go?

A: I followed them to the hospital.

Q: For what purpose?

---

[30] State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012).

[31] State v. Rodriguez, 146 Wn.2d 260, 269, 45 P.3d 541 (2002) (internal quotation marks omitted) (quoting Sofie v. Fibreboard Corp., 112 Wn.2d 636, 667, 771 P.2d 711 (1989)).

[32] Id. (quoting State v. Mak, 105 Wn.2d 692, 701, 718 P.2d 407 (1986)).

[33] Appellant's Br. at 35.

A:    I think just for a brief time I forgot I was a police officer and I became a grandpa.

Defense Counsel:   Your Honor, objection.  Nonresponsive.

Court:      Sustained.  Jury will disregard.

Defense Counsel:   Move to strike.

Q:    What hospital --

Court:      Granted.  Stop, Mr. Benton.  The jury will disregard the last response.[34]

In renewing his motion for mistrial, Rougeau's counsel argued that Detective Moss "got quite emotional . . . . He was tearing up.  He was crying."[35]  In responding to Rougeau's counsel's argument, the court reminded the prosecutor:

> [T]he reason I'm letting this in primarily is for your argument that it goes to the timeline of when these events occurred.  So I don't want testimony -- if it's something beyond that, you're going to need to get permission, and I want you to talk to every witness who's going to address this on that topic.[36]

And the trial court struck Detective Moss's statement.  We presume the jury followed the instruction to disregard his statement.[37]  Because Rougeau does not establish a substantial likelihood that denying this motion for mistrial affected the jury's verdict, the court did not abuse its discretion.

---

[34] RP (Feb. 12, 2020) at 951.

[35] Id. at 976.

[36] Id. at 977.

[37] State v. Warren, 165 Wn.2d 17, 28, 195 P.3d 940 (2008).

Second, Rougeau argues that the trial court abused its discretion in denying his motion for a mistrial "after a law enforcement witness testified in a manner that implied" he had a criminal history.[38]

Here, on direct examination, the prosecutor engaged in the following exchange with Pierce County Sheriff's Office forensic investigator Steven Wilkins:

Q: And what did you use to do the comparison of Lance Rougeau?

A: I used those fingerprints that I acknowledged a few minutes ago.

Q: And I'm going to show you again. So that's Plaintiff's Exhibit No. 457. Is that what you're talking about?

A: Yes.

Q: And were those obtained when he was booked into the jail on the day he was arrested?

A: These were already in our records.[39]

In moving for a mistrial, Rougeau's counsel argued that Wilkins' testimony violated an order in limine that specifically prohibited any reference to Rougeau's criminal history. The trial court acknowledged that Wilkins' testimony "at least implies, at least for people within the court system, that he's been arrested."[40] But the court denied Rougeau's motion, stating that the answer was "vague enough" that it did not warrant a mistrial.[41] The court offered to provide the jury a limiting instruction or strike Wilkins' response. Defense counsel responded, "I think it can be done in examination

---

[38] Appellant's Br. at 42.

[39] RP (Feb. 26, 2020) at 1845.

[40] Id. at 1848.

[41] Id. at 1847.

of the witness."[42] And on cross-examination, Rougeau's counsel went on to elicit testimony from Wilkins, who provided various explanations to the jury as to why someone's fingerprints could be in the "database" apart from criminal history, such as law enforcement officers, individuals who apply for concealed weapons permits, and anyone who applies for a job that requires a background check. Because Rougeau cannot establish prejudice, the trial court did not abuse its discretion.

IV. Prosecutorial Misconduct

Rougeau contends that the prosecutor committed misconduct in opening statement and closing argument "by repeatedly appealing to the passions and prejudices of the jurors."[43] We review a claim of prosecutorial misconduct for an abuse of discretion.[44] We "must consider the comments in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury."[45]

"'A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.'"[46] Prosecutors must "'seek convictions based only on probative evidence

---

[42] Id. at 1848-49.

[43] Appellant's Br. at 37.

[44] State v. Ramos, 164 Wn. App. 327, 333, 263 P.3d 1268 (2011) (citing State. v. Ish, 170 Wn.2d 667, 676, 257 P.3d 551 (2011)).

[45] State v. Edvalds, 157 Wn. App. 517, 521, 237 P.3d 368 (2010) (citing State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)).

[46] State v. Craven, 15 Wn. App. 2d 380, 385, 475 P.3d 1038 (2020) (citing RPC 3.8 cmt. 1), review denied, 197 Wn.2d 1005, 483 P.3d 784 (2021).

and sound reason.'"[47]  A prosecutor commits misconduct by "seeking a conviction based on emotion rather than reason."[48]  And references to evidence outside the record constitute misconduct.[49]

A defendant claiming prosecutorial misconduct bears the burden of establishing "the impropriety of the prosecutor's comments as well as their prejudicial effect."[50]  "In determining whether prosecutorial misconduct has occurred, we look at whether the defendant objected to the alleged misconduct."[51]  If the defendant objected, we evaluate whether the prosecutor's comments were improper and whether those improper comments prejudiced the defendant's case.[52]  A prosecutor's comments were improper if the prosecutor's arguments were "calculated to inflame the passions or prejudices of the jury."[53]  A prosecutor's comments prejudiced the defendant if there is "a substantial likelihood that the misconduct affected the jury verdict."[54]

In opening statement, the prosecutor stated:

---

[47] Id. (citing In re Pers. Restraint of Glasmann, 175 Wn.2d 696, 704, 286 P.3d 673 (2012) (plurality opinion)).

[48] Id. (citing State v. Echevarria, 71 Wn. App. 595, 598, 860 P.2d 420 (1993)).

[49] State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (citing State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988)).

[50] State v. Schlichtmann, 114 Wn. App. 162, 167, 58 P.3d 901 (2002) (citing State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).

[51] State v. Magers, 164 Wn.2d 174, 191, 189 P.3d 126 (2008) (citing State v. Gentry, 125 Wn.2d 570, 640, 888 P.2d 1105 (1995)).

[52] State v. Pierce, 169 Wn. App. 533, 551-52, 280 P.3d 1158 (2012).

[53] State v. Thierry, 190 Wn. App. 680, 690, 360 P.3d 940 (2015) (citing Glasmann, 175 Wn.2d at 704).

[54] State v. Salas, 1 Wn. App. 2d 931, 939, 408 P.3d 383 (2018).

[Sweezer's granddaughter] was born in spring of 2017, and a few months later, her grandmother, Linda Sweezer, was granted custody to care for her granddaughter. She took a leave of absence from her work as part of that process, and she was scheduled to return to work, her job at Providence Health Care, on Monday, October 23rd of 2017, at 9:00 a.m.[55]

At about 10:00 a.m. on October 25th, shortly before they were planning to enter the house anyway, the detectives learned that Linda had received custody and was caring for her granddaughter[ ]. It was the first time they had learned of the child. Detectives entered the house and found [Sweezer's granddaughter] lying on a bed in the master bedroom. [Sweezer's granddaughter] was not moving and was very lethargic, but she was alive. Deputies called for medical aid. The State expects a medical expert will testify that [Sweezer's granddaughter] had been without care for anywhere from 24 to in excess of 48 hours. And [Sweezer's granddaughter] has recovered and is doing well.[56]

After opening statements, Rougeau's counsel moved for a mistrial on the ground that the prosecutor's comments improperly appealed to the passions and prejudices of the jury. Rougeau's counsel noted that "Juror 11 [had] a physical reaction [to the prosecutor's statements] because, not knowing if that child [was] alive or dead, her hands [covered] her face because she [was] afraid of what she [was] going to hear."[57] But the prosecutor's comment about Sweezer's granddaughter, namely, that she "was not moving and very lethargic, but alive," was not "calculated to inflame the passions and prejudices of the jury." Rather, the prosecutor's statement was supported by the evidence presented at trial and demonstrated an attempt to factually outline the timeline of events, notably, Sweezer's murder, by specifically referencing the state of Sweezer's

---

[55] RP (Feb. 10, 2020) at 558.

[56] Id. at 564.

[57] Id. at 583.

21

granddaughter when the officers found her and how long the medical expert believed she was left alone.[58] "The purpose of the prosecutor's opening statement is to outline the material evidence the State intends to introduce."[59] And as this court noted in State v. Craven, the facts of some crimes are inherently emotional but referring to those facts is not in itself misconduct.[60] Rougeau fails to establish that the prosecutor's comments in opening statement were improper.

In closing argument, the prosecutor stated:

> Over the last few weeks, you've been introduced to this woman. Her name is Linda Sweezer. At age 64, she took on a new role, a role often not reserved for those at that point in their life. She went through the process of adopting her granddaughter. Took her into her home. You've seen the pictures, and you will have access to more pictures that show you how seriously she took this role. The home is replete with toys, diapers, a nursery. There are blankets on the floor. There are children's books on the floor.[61]

> . . . .

> [Defense Counsel]: I'm going to object at this time. . . . Counsel's argument is to the passions and prejudices of the jury.

> Court: Overruled.

> . . . .

---

[58] Pierce County Sheriff's Office Lieutenant Kevin Roberts testified, "The child was not moving, not making any sound. I could smell the soiled diaper. I announced that there was a child in the room. Shortly after that, I think the announcements [were to] see [if] the baby's eyes were fixed. I immediately checked on the child. I could see that the child was alive, but still remained very, very lethargic and no sounds." RP (Feb. 10, 2020) at 668.

[59] State v. Kroll, 87 Wn.2d 829, 834, 558 P.2d 173 (1976).

[60] 15 Wn. App. 2d 380, 389 n. 22, 475 P.3d 1038 (2020), review denied, 197 Wn.2d 1005, 483 P.3d 784 (2021).

[61] RP (Mar. 4, 2020) at 2254.

[Prosecutor]: . . . All of the evidence in this case proves that she did not leave that home willingly. She fought. She fought for her life. She fought for her granddaughter's life.

At some point later, the final indignity, her body was dumped from her car and set on fire. The Court has read to you what the law is in this case, and it's your job and your role to accept that as the law and apply it to the facts of this case as you have heard it.[62]

. . . .

. . . [The medical examiner] wasn't able to rule out the very small possibility that [Sweezer] still may have been alive when she was set on fire. He believed she was dead. I think everyone can hope she was in fact at that point as well.

[Defense Counsel]: Objection, Your Honor. Counsel's argument is playing to the passions and prejudices of the jury.

Court: Overruled.[63]

. . . .

[Prosecutor]: Blood got on the carpet because Linda Sweezer fought. She fought for her granddaughter. She fought for her --

[Defense Counsel]: Objection, Your Honor. Plays to the passions and prejudices of the jury when he makes that argument.

Court: Overruled, but move on, Mr. [Prosecutor].[64]

Rougeau argues that the prosecutor's statement that "the medical examiner wasn't able to rule out the very small possibility that [Sweezer] still may have been alive when she was set on fire" was misconduct. But in closing argument, prosecutors have "'wide latitude to argue reasonable inferences from the evidence.'"[65] And the evidence

---

[62] Id. at 2255.

[63] Id. at 2265.

[64] Id. at 2280.

[65] Thierry, 190 Wn. App. at 689 (quoting Glasmann, 175 Wn.2d at 704).

presented at trial did not eliminate this possibility.[66]  Further, as discussed, the fact that a prosecutor references a crime that is "inherently emotional" is not itself misconduct. This statement was not improper.

Rougeau also contends that the prosecutor's references to "the baby in unnecessary and gratuitous ways" constituted misconduct.[67]  A few sentences into his closing argument, the prosecutor stated that Sweezer "went through the process of adopting her granddaughter."[68]  But evidence of the adoption was not admitted at trial.[69]

At oral argument before this court, the State conceded that the prosecutor's reference to the adoption was improper.[70]  We agree.

Rougeau further argues that the prosecutor's repeated comments that Sweezer "fought for her granddaughter" were misconduct.  Read as a whole, the prosecutor's statements were improper because the prosecutor used Sweezer's relationship with her granddaughter as a framework to structure his entire closing argument.  These

---

[66] Pierce County Medical Examiner Thomas Clark testified, "I think it's most likely that she was already dead when she was burned.  That is not a hundred percent, however, because she doesn't have any injury that would lead to death a hundred percent of the time.  My best interpretation is that she actually died as a result of strangulation, was probably transported and burned after she was dead.  However, there isn't any guarantee, and I can't exclude the possibility that she was alive, conscious or unconscious, and burned.  I don't have any way of knowing." RP (Feb. 12, 2020) at 2009.

[67] Appellant's Br. at 38.

[68] RP (Mar. 4, 2020) at 2254.

[69] "'Conduct is improper if, for example, . . . it refers to matters outside the record.'"  Matter of Sandoval, 189 Wn.2d 811, 832, 408 P.3d 675 (2018) (quoting State v. Davis, 175 Wn.2d 287, 330, 290 P.3d 43 (2012)).

[70] Wash. Court of Appeals oral argument, State v. Rougeau, No. 83493-2-I (Apr. 27, 2022), at 13 min., 30 sec., through 13 min., 55 sec. https://tvw.org/video/division-1-court-of-appeals-2022041066/?eventID=2022041066.

comments demonstrated a thematic attempt to encourage the jury to rely on their emotions by generating sympathy for Sweezer and anger toward Rougeau. The prosecutor's statements here improperly appealed to the jurors' emotions. This was misconduct.

Next, we must determine whether the improper statements regarding Sweezer's granddaughter were prejudicial. "'The criterion always is, has such a feeling of prejudice been engendered or located in the minds of the jury as to prevent [a defendant] from having a fair trial.'"[71] Here, the evidence presented at trial established that Sweezer had a violent encounter with Rougeau at her residence which ultimately culminated in her death. Specifically, at trial, the medical examiner testified that Sweezer was stabbed at least 35 times but manual strangulation was the cause of death. Officers testified that there was blood spatter in the kitchen and the garage at Sweezer's residence and that at the time of his arrest, Rougeau had scratches on his forearm, hand, and leg. Forensic investigators testified that the knife found in Sweezer's kitchen had Sweezer's blood on it and that Rougeau's DNA and blood were found at Sweezer's residence. The evidence presented at trial supports a reasonable inference that Sweezer struggled to survive. And taking the prosecutor's statements in the context of the evidence as a whole, Rougeau does not establish that these improper statements influenced the jury's verdict such that Rougeau was prevented from having a fair trial.

---

[71] State v. Pinson, 183 Wn. App. 411, 419-20, 333 P.3d 528 (2014) (quoting State v. Emery, 174 Wn.2d 741, 762, 278 P.3d 653 (2012)).

Rougeau fails to show that the prosecutor's comments in closing argument regarding the adoption and the other statements about Sweezer's granddaughter prejudiced his case.

V.  Sentencing

Rougeau argues that his offender score was incorrectly calculated because the trial court applied the burglary antimerger statute instead of considering whether his two prior convictions from 2014 encompassed the same criminal conduct.  The State concedes error.  Because the trial court erred in failing to conduct a same criminal conduct analysis, we accept the State's concession and remand for resentencing.[72]

VI.  Cumulative Error

Rougeau argues that cumulative error deprived him of a fair trial.  "'The cumulative error doctrine applies where a combination of trial errors denies the accused a fair trial even where any one of the errors, taken individually, may not justify reversal.'"[73]  Rougeau demonstrates that the prosecutor committed misconduct and that

---

[72] On March 17, 2021, Rougeau submitted a statement of additional grounds (SAG) under RAP 10.10.  But our review of a SAG is limited by "several practical limitations."  For example, we "consider only issues raised in a statement of additional grounds that adequately inform us of the nature and occurrence of the alleged errors.  Further, we only consider arguments that are not repetitive of briefing."  State v. Calvin, 176 Wn. App. 1, 26, 316 P.3d 496 (2013), as amended on reconsideration (Oct. 22, 2013), review granted in part, cause remanded, 183 Wn.2d 1013, 353 P.3d 640 (2015); RAP 10.10.  In his SAG, Rougeau appears to argue that the court's "jury instructions were wrong," that there were "false allegations made by officers of the law," and that the prosecutor committed misconduct.  SAG at 1.  Because Rougeau's arguments are largely repetitive of his counsel's briefing and his other argument relies on facts that are absent from the record on appeal, we need not address his arguments.

[73] State v. Song Wang, 5 Wn. App. 2d 12, 31, 424 P.3d 1251 (2018) (quoting In re Det. of Coe, 175 Wn.2d 482, 515, 286 P.3d 29 (2012)).

the trial court committed a sentencing error by failing to conduct a same criminal conduct analysis on two of his prior convictions from 2014. Because the prosecutor's misconduct is the only trial error committed here, the cumulative error doctrine is not implicated.[74]

Therefore, we affirm the convictions and remand for resentencing.

_____

WE CONCUR:

_____        _____

---

[74] Additionally, Rougeau appears to challenge the trial court's denial of his motion for arrest of judgment or a new trial. Appellant's Br. at 2. But Rougeau merely assigns error to the trial court's denial without including any argument or authority. Therefore, we need not address Rougeau's motion for new trial. RAP 10.3(a)(4) and (6).